IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAHUL TELANG and ASHWINI GANDHE, husband and wife,<br><br>        Plaintiffs,<br><br>    v.<br><br>NVR, INC. t/d/b/a RYAN HOMES,<br><br>        Defendant. | *Electronically Filed*<br><br>No. 2:19-cv-01025-WSH<br><br>Honorable W. Scott Hardy |

**CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF
NVR, INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant, NVR, Inc. t/d/b/a Ryan Homes ("NVR"), by and through its undersigned counsel, Kathleen A. Gallagher, Russell D. Giancola, and Gallagher Giancola LLC, hereby files this concise statement of undisputed and material facts in support of its motion for summary judgment, as follows:

**A. Parties**

1. Plaintiffs, Rahul Telang and Ashwini Gandhe, have been married since 1999. (Telang Dep., attached as Ex. A, at 11; Gandhe Dep., attached as Ex. B at 9).

2. NVR is a Virginia corporation that builds and sells homes in Pennsylvania and other states. (Compl., attached as Ex. C, ¶¶ 4–5; Ans., attached as Ex. D, ¶¶ 4–5).

**B. The Purchase Agreement**

3. On April 23, 2007, the Plaintiffs and NVR entered into a Pennsylvania Purchase Agreement. (Ex. C ¶ 9; Ex. D ¶ 9; Ex. B at 41; Purchase Agreement, attached as Ex. E).

4. Under the Purchase Agreement, NVR agreed to build, and Plaintiffs agreed to purchase a Highgrove model home. (Ex. E at 1).

5. Under the Purchase Agreement, Plaintiffs had a right to inspect the home prior to settlement and had the opportunity to note any items which the Plaintiffs believed needed to be addressed. (Ex. E at 2 § 3(c)).

6. The Purchase Agreement also gave the Plaintiffs "the right to schedule a private home inspection ('Inspection') of the Property by an independent private home inspector, at Purchaser's sole expense, not less than 48 hours prior to the Pre-Settlement Demonstration." (Ex. E at 2 § 3(d)).

7. Under the Purchase Agreement, "[i]n the event any deficiency identified by the Inspection is not in compliance with local codes or acceptable construction practices as defined in Seller's Limited Warranty, [NVR] shall correct such deficiency in a timely manner and the correction of any such deficiency shall not delay Settlement unless the deficiency is of such a nature as to make the Property uninhabitable." (Ex. E at 2 § 3(d)).

8. The Purchase Agreement also includes a contractual limitations period applicable to all claims which provides in relevant part as follows:

> PURCHASER AND SELLER COVENANT AND AGREE THAT ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY CLAIMS BASED IN WHOLE OR IN PART ON FACTS OCCURRING BEFORE SETTLEMENT, WHETHER KNOWN OR UNKNOWN, AND THAT ARISE OUT OF OR RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, SETTLEMENT HEREUNDER, THE AGREED IMPROVEMENTS TO THE PROPERTY (WHETHER AS-BUILT OR AS-PROMISED) AND/OR THE HEREIN DESCRIBED REAL ESTATE, REGARDLESS OF LEGAL THEORY AND REGARDLESS OF THE NAMED RESPONDENT(S)/DEFENDANT(S) ("CLAIMS"), SHALL BE GOVERNED BY A ONE (1) YEAR LIMITATION OF ACTION PERIOD AND BAR DATE RUNNING FROM THE DATE THE CLAIM OR CAUSE OF ACTION ACCRUES (IF AT ALL). CONSISTENT WITH THE FOREGOING, ALL SUCH CLAIMS BASED ON MATTERS OCCURING BEFORE THE SETTLEMENT DATE SHALL BE DEEMED TO HAVE ARISEN AND ACCRUED, IF AT ALL, AND THE AFORESAID ONE YEAR LIMITATION OF ACTION PERIOD FOR ALL SUCH CLAIMS SHALL BEGIN TO RUN NOT LATER THAN THE SETTLEMENT DATE. WITH THE

SOLE EXCEPTION OF COUNTERCLAIMS, ANY SUCH CLAIMS INITIATED IN ANY FORUM AGAINST ANY PARTY TO THIS AGREEMENT AND/OR THEIR JOINT AND SEVERAL SUCCESSORS, MEMBERS, AFFILIATES, EMPLOYEES, AGENTS, CONTRACTORS AND/OR SUPPLIERS BY ANY OTHER PARTY TO THIS AGREEMENT AND/OR THEIR SUCCESSORS, SUBROGEES AND ASSIGNS SHALL BE DEEMED AUTOMATICALLY BARRED AND PRECLUDED AS A MATTER OF LAW AND CONTRACT IF NOT FILED/INITIATED WITHIN THAT AGREED ONE (1) YEAR LIMITATION OF ACTION PERIOD FOLLOWING SETTLEMENT AND BEFORE SAID BAR DATE.  ALL APPLICATION OF THE SO-CALLED "DISCOVERY RULE" IS MUTUALLY WAIVED BY THE PARTIES.  BY EXECUTING THIS AGREEMENT, PURCHASER ACKNOWLEGES PURCHASER'S UNDERSTANDING AND AGREEMENT TO THESE TERMS AND THAT THE SAID ONE (1) YEAR PERIOD IS COMPLETELY REASONABLE IN ALL RESPECTS.

(Ex. E at 5–6, § 13).

9. Plaintiff's initials appear in the bottom right corner of the margin on Pages 5 and 6. (Ex. E at 5–6).

### C. Construction of the Home

10. After the parties executed the Purchase Agreement, NVR built the Plaintiffs' home, completing construction in the fall of 2007.  (Ex. C ¶ 10; Ex. D ¶ 10).

11. The Highgrove model built by NVR includes two furnace systems: one in the basement and one in the attic.  (Ex. C ¶ 12; Ex. D ¶ 12).

12. As designed, the furnace system in the attic sits on a plywood platform approximately 6 feet by 8 feet in size.  (Ex. C ¶ 13; Ex. D ¶ 13; Simon Dep., attached as Ex. F, at 21, 46–47, 83).

13. The design of the attic platform for the Plaintiffs' home is reflected in NVR's roof framing plan for the Highgrove model, version 9.  (Ex. F at 46 and Ex. 5 thereto).

14. The roof framing plan depicts the attic platform as follows:

3



(Ex. F at 46 and Ex. 5 thereto).

15. A catwalk connects the attic opening to the attic platform. (Ex. F at 45).

16. Blown insulation is installed in the attic in the space adjacent to the side of the attic platform opposite the catwalk. (Ex. F at 26).

17. As built, the attic platform in the Plaintiffs' home measures approximately 8 feet by 8 feet, even larger than the designed platform. (Ex. F at 24, 47).

18. The attic furnace and platform appear as such:

4



(Ex. F at 19 and Ex. 3 thereto).

19. The measurements of the catwalk and attic platform, and the location of the attic furnace are depicted as follows:



(Rudd Dep., attached as Ex. G, at 13–14 and Ex. A thereto at 20).

20. The return air filter access in the attic furnace is 63 inches—more than 5 feet—from the far end of the attic platform. (Ex. G at 13–14 and Ex. A thereto at 20).

### D. Building Permit Process

21. The Plaintiffs' home is located at 1426 Mystic Valley Drive, Franklin Park, Pennsylvania 15143. (Ex. C ¶ 5; Ex. D ¶ 5).

22. Franklin Park Borough (the "Borough") requires a building permit before a builder can begin construction of a house. (Phillips Dep., attached as Ex. H, at 22).

23. The building permit application must include construction drawings for the Borough to review. (Ex. H at 22, 39).

24. The Borough reviews the drawings and plans submitted to assure that they comply with the applicable International Residential Code. (Ex. H at 39–40).

25. The Borough's review and all inspections are performed by building code officials and inspectors who have the certifications required under the Uniform Construction Code. (Ex. H at 30–31).

26. If there are any deficiencies in the permit application or drawings, the Borough sends the builder a letter and asks the builder to address the deficiencies before it will issue a building permit. (Ex. H at 22).

27. If the permit application and drawings are in accordance with the Borough's building codes, the Borough issues a building permit. (Ex. H at 22).

28. NVR applied for a building permit to construct the Plaintiffs' house on May 16, 2007. (Ex. H at 73–74 and Ex. 8 thereto at NVR-000475).

29. NVR's application included the construction drawings for the Plaintiffs' house. (Ex. H at 114).

30. The drawings submitted by NVR met the Borough's code requirements. (Ex. H at 77).

31. Accordingly, the Borough approved NVR's application for a building permit on May 22, 2007, and it issued a building permit on May 24, 2007. (Ex. H at 75, 86–87 and Ex. 8 thereto at NVR-000475, NVR-000489).

32. At the time NVR applied for a building permit, the Borough had adopted the 2006 version of the International Residential Code. (Ex. H at 25).

33. According to a written code opinion by the International Code Council ("ICC")—which issued the 2006 International Residential Code—the installation of an 8 feet x 8 feet plywood floor constructed on the bottom chord of the attic roof trusses that holds HVAC

equipment in the attic does not require guards around the plywood surface. (Steinle Dep., attached as Ex. I, at 17–18 and Ex. A thereto at 9).

34. Plaintiffs' expert architect concedes that such written code opinions are authoritative. (Shinsky Dep., attached as Ex. J, at 60).

35. Plaintiffs' expert engineer concedes that such written code opinions "have some authority," and constitute "the ICC providing an opinion of what its own publications provide." (Stichter Dep., attached as Ex. K, at 106–08).

**E. Inspections and Sale of the Home**

36. During the construction process, the Borough conducts periodic inspections to assure the home complies with applicable building codes. (Ex. H at 53).

37. Among the inspections the Borough conducts is a framing inspection. (Ex. H at 54).

38. The Borough was required to conduct an inspection of the passageway and platform that housed a furnace in the Plaintiffs' attic. (Ex. H at 68–69).

39. If such a passageway or platform did not meet applicable building requirements, the deficiency would need to be addressed before an occupancy permit could be issued. (Ex. H at 69).

40. After a home has passed all inspections, the Borough issues a certificate of occupancy. (Ex. H at 52, 55).

41. The Borough conducted a framing inspection on August 1, 2007. (Ex. H at 88–89 and Ex. 8 thereto at NVR-000486).

42. The Borough did not note any deficiency with the framing of the attic, including the attic platform. (Ex. H at 95 and Ex. 8 thereto at NVR-000486).

43. On October 1, 2007, NVR applied for a certificate of occupancy. (Ex. H at 107 and Ex. 8 thereto at NVR-000491).

44. The Borough completed all required inspections of the Plaintiffs' house and issued a certificate of occupancy on October 31, 2007 (Ex. H at 109 and Ex. 8 thereto at NVR-000479).

45. With respect to the installation of the attic furnace, Plaintiffs' home complied with all applicable regulations, including the Pennsylvania Uniform Construction Code and the 2006 International Residential Code. (Ex. H at 122, 150–51).

46. Pursuant to § 3(c) of the Purchase Agreement, the Plaintiffs conducted a pre-settlement demonstration of the house with the project manager. (Ex. A at 70).

47. Dr. Telang acknowledged signing a Pre-Settlement Demonstration Report. (Ex. A at 70–71 and Ex. 1 thereto).

48. The Pre-Settlement Inspection Report noted that the Plaintiffs reviewed the appliances and the attic insulation depth on October 31, 2007. (Ex. A at Ex. 1 thereto).

49. The Pre-Settlement Inspection Report noted that the attic steps lid needed to be "tu" [touched-up] and re-nailed. (Ex. A Ex. 1).

50. No other alleged defect was identified in the attic. (Ex. A at Ex. 1 thereto).

51. Although Dr. Telang does not recall inspecting the attic, he does not dispute the accuracy of the Pre-Settlement Inspection Report. (Ex. A at 74–75).

52. Plaintiffs purchased the home from NVR on November 5, 2007. (Ex. C ¶¶ 5, 11; Ex. D ¶¶ 5, 11).

F. **Plaintiffs' Occupation of the Home**

53. Plaintiffs moved into the home in 2008. (Ex. A at 10).

54. From the time they purchased their house until January 28, 2019—a period of over 11 years—Plaintiffs never changed the air filter in the attic furnace and never had someone else change the air filter. (Pls.' Ans. to Interrogs., attached as Ex. L, #15; Ex. A at 75–76; Ex. B at 52).

55. Prior to January 28, 2019, Dr. Telang went into the attic between one and three times to change a light bulb. (Ex. L. #16; Ex. A at 78–80).

### G. Dr. Telang Falls Through the Attic on January 28, 2019

56. On January 28, 2019, Dr. Telang entered the attic to change the air filter in the attic furnace. (Ex. B at 55).

57. Plaintiffs claim that while he was in the attic, Dr. Telang fell through the insulation and ceiling joists on the far side of the platform, more than 5 feet past the location of the return air filter access. (Ex. C ¶ 26; Ex. G at Ex. A thereto at 20).

58. Plaintiffs do not aver in the Complaint what Dr. Telang was doing in the attic immediately before his fall. (Ex. C ¶ 26).

59. When he went to the attic, Dr. Telang was accompanied by his son S. T. (S. T. Dep., attached as Ex. M, at 25).

60. S. T. did not enter the attic with his father; rather, he remained at the bottom of the attic stairs. (Ex. M at 25).

61. S. T. could not see his father in the attic. (Ex. M at 25).

62. The Plaintiffs' other son, S. T., was in the kitchen when Dr. Telang went to the attic. (S. T. Dep., attached as Ex. N, at 25).

63. Prior to the incident, Dr. Telang had warned both of his sons not to step on any insulation in the attic. (Ex. M at 25, 30; Ex. N at 34–35).

64. As he was ascending the stairs to the attic, Dr. Telang advised both of his sons that "there is a platform in the attic, and there is insulation," and that "you should always stay on the platform if you ever come up" to the attic. (Ex. N at 34–35).

65. Dr. Telang told S. T. that stepping on the insulation was dangerous. (Ex. M at 26).

66. No one saw Dr. Telang in the attic prior to the incident. (Ex. M at 25; Ex. N at 25; Ex. B at 55–56).

67. Dr. Telang has no recollection of what he was doing in the attic. (Ex. A at 81–84).

68. In fact, Dr. Telang has no recollection of the day of the incident. (Ex. A at 83).

69. Dr. Telang's last memory before his fall was that he ate dinner after returning from a golf trip and went to bed. (Ex. A at 81–82).

70. Dr. Telang returned from that golf trip the day before the incident. (Ex. B at 55).

71. Dr. Telang has no recollection of what caused him to fall. (Ex. A at 83–84).

72. Plaintiffs have served the reports of two liability experts: engineer Michael A. Stichter, Ph.D., P.E. and architect Anthony J. Shinsky, RA. (Pls.' Rule 26(a)(2) Expert Disclosures, attached as Ex. O, at 3).

73. Mr. Shinsky admitted that he has no information regarding what Mr. Telang was doing in the attic prior to his fall. (Ex. J at 39, 92–93).

74. Mr. Shinsky further admitted that he does not know the reason or reasons Dr. Telang "was off the work area platform and fell through the insulation and drywall ceiling to the foyer floor below." (Ex. J at Ex. 2 thereto at 4 § 4.0).

75. Dr. Stichter likewise admitted that he does not know what caused Dr. Telang to fall. (Ex. K at 115–16).

### H. Procedural History

76. Plaintiffs commenced this action by filing a Complaint in the Court of Common Pleas of Allegheny County on July 30, 2019, at Docket No. GD 19-015706.  (Ex. C at 1).

77. On August 15, 2019, NVR removed this action to this Court pursuant to its diversity jurisdiction.  (Notice of Removal, Doc. 1, attached as Ex. P, at 3).

78. The parties have completed fact and expert discovery.  (Order, Doc. 45, attached as Ex. Q).

Dated:  December 10, 2021

Respectfully submitted,

**GALLAGHER GIANCOLA LLC**

*/s/ Russell D. Giancola*
Kathleen A. Gallagher
PA I.D. No. 37950
kag@glawfirm.com
Russell D. Giancola
PA I.D. No. 200058
rdg@glawfirm.com
3100 Koppers Building
436 Seventh Avenue
Pittsburgh, PA  15219
412.717.1900 (Phone)
412.717.1901 (Fax)

*Counsel for Defendant*
*NVR, Inc. d/b/a Ryan Homes*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2021, a true and correct copy of the **Concise Statement of Material Facts** has been electronically served via CM/ECF on the below counsel of record:

Jonathan M. Gesk, Esq.
Gesk Moritz, LLC
14 East Main Street
Carnegie, PA  15106
jgesk@gesklaw.com

Brendan B. Lupetin, Esq.
Meyers Evans Lupetin & Unatin, LLC
707 Grant Street
Gulf Tower, Suite 3200
Pittsburgh, PA  15219
blupetin@meyersmedmal.com

*Counsel for Plaintiffs*

GALLAGHER GIANCOLA LLC

*/s/ Russell D. Giancola*
Kathleen A. Gallagher
Russell D. Giancola