| | | |
|---|---|---|
| RAHUL TELANG and ASHWINI GANDHE, husband and wife, | ) ) | *Electronically Filed* |
| | ) | No. 2:19-cv-01025-WSH |
| Plaintiffs, | ) ) | |
| | ) | Honorable W. Scott Hardy |
| v. | ) | |
| | ) | |
| NVR, INC. t/d/b/a RYAN HOMES, | ) | |
| | ) | |
| Defendant. | ) | |

## NVR, INC.'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, NVR, Inc. t/d/b/a Ryan Homes ("NVR"), by and through its undersigned counsel, Kathleen A. Gallagher, Russell D. Giancola, and Gallagher Giancola LLC, hereby submits this reply brief in support of its motion for summary judgment.

### I.    INTRODUCTION

Plaintiffs' Brief in Opposition (the "Opposition") merely confirms that summary judgment is appropriate. In the Opposition, Plaintiffs state—for the first time—that they are asserting a claim under Restatement (Second) of Torts § 323. But § 323 does not apply in this action, and Plaintiffs failed to plead facts to support this claim. Further, in response to NVR's contractual limitations defense, Plaintiffs attempt to inject ambiguity where none exists. Under the plain language of the Purchase Agreement, the Plaintiffs' claims constitute "claims" as defined in the Purchase Agreement that had an agreed-upon accrual date. By failing to bring the alleged defect in the design or construction of the attic platform and HVAC system to NVR's attention within one year after settlement on the house, Plaintiffs' claims are time-barred. Accordingly, Plaintiffs' claims fail as a matter of law and should be dismissed.

## II. RESTATEMENT (SECOND) OF TORTS § 323 IS INAPPLICABLE HERE

Confronted with having wholly failed to present any evidence of proximate cause, Plaintiffs instead have pivoted theories, arguing for the first time that Restatement (Second) of Torts § 323(a)—often called the Good Samaritan Doctrine, *Filter v. McCabe*, 733 A.2d 1274—dispenses with their need to establish this essential element. Plaintiffs' new position fails because § 323 does not apply in this context and Plaintiffs failed to plead facts to support a claim under § 323.

### A. Restatement (Second) of Torts § 323(a) Does Not Apply

In adopting Section 323(a), the Pennsylvania Supreme Court observed that it applies only to "a particular class of tort actions," and that it "differs from those cases normally sounding in tort." *Hamil v. Bashline*, 392 A.2d 1280, 1286 (Pa. 1978). By its terms, it applies only when a defendant "render[s] services to another which he should recognize as necessary for the protection of the other's person or things." RESTATEMENT (SECOND) OF TORTS § 323. The Good Samaritan Rule "does not, however, change the burden of a plaintiff to establish the underlying elements of an action in negligence, nor can it be invoked to create a duty where one does not exist." *Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 (Pa. 1983).

Section 323 is most commonly applied in the medical malpractice context. That was the nature of the claims cited in Plaintiffs' Opposition. *See Hamil*, 392 A.2d 1280 (wrongful death claim arising from doctor's alleged failure to properly diagnose the decedent's condition); *K.H. v. Kumar*, 122 A.3d 1080 (Pa. Super. 2015) (medical malpractice action predicated on alleged failures to report suspicions of child abuse). A separate line of cases applies § 323 to the performance of safety inspections. *See, e.g.*, *Isaacson v. Mobile Propane Corp.*, 6 Phila. 345, 348 (Ct. C.P. Philadelphia County 1981) (citing *Evans v. Liberty Mut. Ins. Co.*, 398 F.2d 665 (3d Cir.

1968) and holding that "Pennsylvania imposes a duty on an entity which conducts safety inspections to perform those inspections in a reasonable fashion"); *Patentas v. United States*, 687 F.2d 707 (3d Cir. 1982) (claims against the federal government premised upon tanker explosion, alleging that Coast Guard negligently inspected the tanker); *Blessing v. United States*, 447 F. Supp. 1160 (E.D. Pa. 1978) (claims premised on allegedly negligent inspections by OSHA); *Scott v. Families United Network, Inc.*, No. 17-cv-5295, 2020 Pa. Dist. & Cnty. Dec. LEXIS 968 (Ct. C.P. Dauphin County May 4, 2020) (negligence claim arising from a fire premised upon failure to properly inspect).

But Plaintiffs failed to cite a single case in which § 323 was applied to builders. This makes sense, as the Good Samaritan Doctrine requires a promise of protection. *See Miller v. United States*, 530 F. Supp. 611, 617 (E.D. Pa. 1982). The relationship between Plaintiffs and NVR was governed by the Purchase Agreement, which contained no such promise of protection. *See* Doc. 59-5. Given the limited context under which the Pennsylvania Supreme Court adopted § 323, Plaintiffs' suggestion that the Good Samaritan Doctrine could be applied to the facts of this case threatens to expand this narrow exception to rewrite the standard of traditional tort claims.

Plaintiffs' last-ditch effort to ease their burden of proof for their traditional negligence and professional negligence claims fails. Plaintiffs must still present evidence of duty, breach, causation, and damages. The limited context in which § 323 has been adopted in Pennsylvania does not extend to homebuilding and cannot serve as an end-around for Plaintiffs' failure to proffer any evidence of causation.

### B. Plaintiffs Did Not Plead Allegations for a Claim Under § 323(a)

Even if the Good Samaritan Law applied to the case at hand—which it does not— Plaintiffs' eleventh-hour effort to transform their claims to fit under the Good Samaritan Law fails

because Plaintiffs never pleaded facts to support this theory. Plaintiffs' complaint does not allege that NVR's alleged negligence *increased the Plaintiffs' risk of harm*. Rather, Plaintiffs have claimed only that Dr. Telang's injuries "were caused by the negligence of NVR." *See* Complaint, Doc. 59-3, ¶¶ 30, 41; *see also id.* ¶¶ 31–32, 37–38. Courts have held that purported claims under the Good Samaritan Law under these exact circumstances are legally insufficient.

In *Blessing v. United States*, 447 F. Supp. 1160 (E.D. Pa. 1978), plaintiffs sued the federal government under the Federal Tort Claims Act, claiming it was liable for negligent inspections of their places of employment. The court held that the complaints were deficient under Rule 12(b)(6), requiring Plaintiffs to file amended complaints or their claims would be dismissed. *Id.* at 1200. In so ruling, the Court held that the Plaintiffs' complaints contained "no allegations that plaintiffs or their employers relied on the OSHA inspections or that the alleged negligence of the OSHA inspectors in any way increased the plaintiffs' risk of harm." *Id.* at 1196–97. Instead, like Plaintiffs' Complaint here, "the only pleadings that might at all go to causation allege only that '[as] a result of the negligence] of the OSHA inspectors the plaintiffs sustained certain injuries." *Id.* at 1197. The court held that "[s]uch boilerplate pleadings may provide an adequate allegation of proximate cause for some common law torts, but they would appear to be insufficient under §§ 323 and 324A." *Id.* The court continued:

> Insofar as both of these sections [§§ 323 and 324A] provide that a negligent actor is liable for "physical harm resulting from his failure to exercise reasonable care to perform his undertaking, *if*" the plaintiff or the one to whom the actor undertook to render services relied on the undertaking or "if" the negligence increased the plaintiff's risk of harm (emphasis supplied), the language of the Restatement assumes that the injuries somehow factually "result" from the defendant's negligence before it even reaches the issues of reliance of increased risk—questions of legal cause. In other words, the harm "results" from the negligence charged is inadequate under the Restatement unless the harm is caused by increased risk or reliance. **Plaintiffs' allegations never get past the "resulting from" language of the Restatement, and so could be said not to address at all the issue of legal cause.**"

4

*Id.* (emphasis added). "Thus, we do not here have ambiguous pleadings that might conceivably be read to include the necessary allegations …. Rather here we have a total failure to include, ambiguously or otherwise, any pleadings reaching the crucial causation factors under §§ 323 and 324A." *Id.* "Because proximate cause is a critical element of a plaintiff's prima facie case in tort, when under § 323 or § 324A the requisite reliance or increased risk or harm does not appear, courts have dismissed, rendered summary judgment, or directed verdicts for defendant, as the case's procedural posture made appropriate." *Id.*

*Blessing* is hardly unique in holding that a complaint which fails to set forth allegations indicating either reliance or increased harm is legally insufficient to maintain a claim under the Good Samaritan Law because of the lack of proximate cause. *See, e.g.*, *Clark v. Employers Mut. Of Wausau*, 297 F. Supp. 286 (E.D. Pa. 1969) (granting summary judgment); *DeJesus v. Liberty Mut. Ins. Co.*, 223 A.21d 849 (Pa. 1966) (affirming dismissal upon preliminary objections); *Evans v. Liberty Mut. Ins. Co.*, 398 F.2d 665 (3d Cir. 1968) (affirming grant of motion for directed verdict); *Miller v. United States*, 530 F. Supp. 611, 617 (E.D. Pa. 1982); *Scott*, 2020 Pa. Dist. & Cnty. Dec. LEXIS 968.

Like the complaints in *Blessing*, Plaintiffs' Complaint does not allege that NVR's alleged negligence increased the Plaintiffs' risk of harm. Instead, Plaintiffs state only that NVR's alleged negligence directly caused Plaintiffs' harm, asserting only that Dr. Telang's injuries "were caused by the negligence of NVR." *See* Complaint, Doc. 59-3, ¶¶ 30, 41. This is the same "resulting from" language used in the *Blessing* complaints that fails to give rise to § 323 liability. Unlike the *Blessing* plaintiffs, however, this case is now at the summary judgment stage, not the motion to dismiss stage. The parties have proceeded through discovery, and the deadline to amend the pleadings has long since passed. Accordingly, Plaintiffs' Complaint should be dismissed.

## III. THE OTHER CASES PLAINTIFFS CITE ARE UNAVAILING

Plaintiff wrongly suggests that the jury can rely on (nonexistent) circumstantial evidence to reach a verdict in this case. But the cases Plaintiffs suggest are analogous are not.

Plaintiff suggests that the case at hand is "easier to resolve" than *Cade v. McDanel*, 679 A.2d 1266 (Pa. Super. 1995). In *Cade*, the plaintiff sustained injuries after falling out of the defendant's truck. *Id.* at 1270–71. During discovery, the plaintiff testified that she did not jump, and that either the defendant pushed her out of the truck or she fell out as a result of his driving. *Id.* at 1272. Thus, there was direct evidence of the precise cause of the plaintiff's injuries. Likewise, in *Marks v. Tasman*, 589 A.2d 205 (Pa. 1991), the plaintiff testified in his deposition that he tripped while walking on the sidewalk, causing his injuries; other evidence established that the plaintiff tripped in the immediate area of the large depression in the sidewalk. *Id.* at 207.

Here, there is no evidence. Unlike in *Cade* and *Marks*, the Plaintiffs have proffered ***no*** evidence regarding how Dr. Telang came to fall through the attic, or even why he was at the end of the platform, more than five feet away from the return air filter access. Record evidence in *Marks* demonstrated exactly what the plaintiff was doing and the precise cause of his fall. Whereas the evidence in *Cade* provided evidence supporting two different explanations of what caused the plaintiff's fall from the truck, this case provides a vacuum. Thus, the jury's task in *Cade* would be unremarkable: it would need to sift through the evidence to determine which evidence supporting competing alleged causes of the injury was most credible; this is the traditional function of the jury. The jury in this action would have no causal evidence to consider.

Similarly, although Plaintiffs cite *Fitzpatrick v. Natter*, 961 A.2d 1229 (Pa. 2008), the case *supports* the grant of summary judgment. The Pennsylvania Supreme Court bolsters the position outlined in NVR's motion for summary judgment: "[T]here is a limit to the inferences that the jury

may reasonably draw from … circumstantial evidence." *Id.* at 1241. "Viewed as a whole, the 'evidentiary threads' must be sufficient to 'lift [the] contention out of the realm of speculation.'" *Id.* (quoting *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 319 A.2d 914, 923 (Pa. 1974)). "Thus, while the jury may draw reasonable inferences, it 'may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but … there must be evidence upon which logically its conclusion may be based.'" *Id.* at 1241–42 (quoting *Jones v. Treegoob*, 249 A.2d 352, 354 (Pa. 1969). A jury must be able to reason from the evidence "without resort to prejudice or guess." *Id.* at 1242.

But a jury would have no choice but to guess here. What was Dr. Telang doing in the attic when he fell? Why was he on the opposite end of the platform? What caused him to leave the platform? These and other questions cannot be answered from the record evidence. Even in their failed attempt to reframe the causation analysis, Plaintiffs engage in conjecture:

- "Mr. Telang would not have … accidentally stepped off the edge of the platform had there been a safety railing." Doc. 61 at 5. Plaintiffs offered no evidence of the angle, direction, or force with which Dr. Telang fell, and thus they merely assume that a safety railing would have affected Plaintiffs' fall.[1]

---

[1] Plaintiffs' note that NVR "had begun putting up safety railings" a decade before Plaintiffs' fall ignores that: (1) NVR implemented this design change after years after it sold Plaintiffs their home, (2) there is no evidence that NVR appreciated any fall risk prior to construction of Plaintiffs' home, and (3) Plaintiffs cite no duty for a builder to make further design or construction changes on a home after selling it to a customer. Pursuant to Federal Rule of Civil Procedure 56(c)(2), NVR objects to all facts related to the subsequent remedial measures described by Plaintiffs because such evidence is inadmissible. *See* Fed. R. Evid. 407; *Kelly v. Crown Equip. Co.*, 970 F.2d 1273, 1277 (3d Cir. 1992) ("the Rule 407 policy of encouraging people to take steps to make their products safer was equally as supportive of exclusion of evidence of safety measures taken *before* someone is injured by a newly manufactured product, even if those measures are taken in response to experience with an older product of the same or similar design."); *Ankney v. Wakefield*, No. 10-1290, 2012 U.S. Dist. LEXIS 64628, 2012 WL 1633803 (W.D. Pa. May 8, 2012) (explaining the proper procedure for attacking inadmissible evidence on summary judgment is an objection under Rule 56(c)(2)). As only evidence that is "capable of being admissible at trial" may be considered on a motion for summary judgment, *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004) (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir. 1996)), Plaintiffs' reference to subsequent design changes involving safety railings is improper and the Court should not consider it.

- "[Dr. Telang] knew it was dangerous and thus did not intentionally enter into that area." *Id.* There is no evidence regarding Dr. Telang's state of mind at the time of his fall.

- "If NVR had designed the HVAC system so that the filter was located behind the 2nd floor return air register, Dr. Telang would not have fallen as he would not have even been in the attic because he would have been able to change the filter from the safety of his second floor." *Id.* Again, this is speculation. Dr. Telang fell more than 5 feet from the location of the return air filter access. There is no evidence regarding why Dr. Telang was this far from the return air filter access, and if anything, it suggests he was doing something *other than* merely changing the air filter. Thus, the location of the air filter access may not have mattered at all. Indeed, Dr. Telang went into the attic for other reasons prior to his fall. *See* Doc. 59-12 #16; Doc. 59-1 at 12–14. On its face, Plaintiffs' suggestion that relocating the air filter would have prevented the incident is demonstrably false.

Thus, a jury would be forced to speculate and guess to reach a verdict. *Fitzpatrick* and other cases prohibit this. This is precisely the speculation juries are prohibiting from performing. A jury's inferences "must flow directly from admissible evidence." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). With no admissible evidence—or **any** evidence—to establish what Dr. Telang was doing in the attic, why he was on the opposite end of the platform, and what caused him to leave the platform and fall through the attic, summary judgment must be granted.

IV.     **THE CONTRACTUAL LIMITATION BARS PLAINTIFFS' CLAIMS**

All claims in this action are subject to a contract-based one-year limitations period and were time-barred before Plaintiffs commenced this action. Plaintiffs' Opposition does not contest the validity or enforceability of the contractual limitations provision in the Purchase Agreement (Exhibit E at 5–6 § 13). Instead, by overlooking the contractual accrual provision in the Agreement, Plaintiffs mistakenly assert that their claim is timely based on a common law standard for accrual of claims. Plaintiffs ignore that the contractual limitations provision not only sets a

one-year period for bringing an action for NVR's alleged negligence before closing on the home,

but it also sets the accrual date for such claims as the date of settlement. (Exhibit E at 5–6 § 13).

## A. The Purchase Agreement Is Clear and Must Be Accorded Its Plain Meaning

"Pennsylvania contract law begins with the 'firmly settled' point that the intent of the parties to a written contract is contained in the writing itself." *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)). "Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence, instead, the meaning of the clear and unequivocal written contract must be determined by its contents alone." *Id.* (quoting *Steuart v. McChesney*, 444 A.2d 659 (Pa. 1982)). "Where language is clear and unambiguous, the focus on interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Id.* (quoting *Steuart*, 444 A.2d at 659). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Id.* (quoting *Krizovensky*, 624 A.2d at 642).

As shown below, there is only one natural reading of the Purchase Agreement: Plaintiffs' claims constitute "claims" as defined by the contract and, as such, the accrual date is the settlement date in 2007, and any claims needed to be asserted within one year of settlement.

## B. Plaintiffs' Claims Constitute "Claims" Under the Purchase Agreement

The Purchase Agreement includes the claims asserted in this action among the "claims" governed by the contractual limitations provision. The provision defines "claims" as:

- any and all claims arising out of or relating to the subject matter of this agreement

- including but not limited to any claims based in whole or in part on facts occurring before settlement,

- whether known or unknown,

9

- and that arise out of or relate to:

  - the subject matter of this Agreement,
  - settlement hereunder,
  - the agreed improvements to the property (whether as-built or as promised) and/or
  - the herein described real estate

- regardless of legal theory and regardless of the named respondent(s)/defendant(s) ("Claims").

*See* Doc. 59-5 at 5–6 ¶ 13.

Plaintiffs' claims clearly fit within the definition of "claims."

- Plaintiffs' claims arise out of and relate to the subject matter of the Purchase Agreement. All of Plaintiffs' claims assert that defects in NVR's design and construction of their home, the construction of which was the subject of the Purchase Agreement.

- Plaintiffs' claims are based in part on facts occurring before the settlement. By the time of the settlement, Plaintiffs' home had already been designed and constructed, and whatever alleged defects Plaintiffs' claim existed in the attic and HVAC were already completed. In addition, the "including but not limited to" language means that even to the extent Plaintiffs' claims are based on facts occurring after the settlement, they are also included within this definition.

- Both known and unknown claims—which would include claims that had not accrued at the time of settlement—are included within this definition of the "claims."

- Plaintiffs' claims arise out of or relate to the design and construction of the home, which is: (1) the subject matter of the Purchase Agreement), (2) the agreed improvement to the property, and (3) a part of the real estate described in the Purchase Agreement.

None of the terms within the definition of "claims" is ambiguous. And, as shown above, Plaintiffs' claims satisfy each element of that definition. As a result, Plaintiffs' claims constitute "claims" under the Purchase Agreement.

10

## C.  **The Accrual Date Is the Settlement Date**

Having defined the term "claims," the Purchase Agreement then establishes the contractual

limitations period to assert claims.  It provides that Claims:

- Shall be governed by a one (1) year limitation of action period and bar date

- Running from the date the claim or cause of action accrues (if at all).

*See* Doc. 59-5 at 6 ¶ 13.  There is nothing ambiguous about this: a one-year bar date applies,

running from the date the claim accrues.

The only remaining question is when the claim accrues.  This is set forth in the immediately

following sentence:

- Consistent with the foregoing,

- all such claims based on matters occurring before the settlement date

- shall be deemed to have arisen and accrued, if at all, and the aforesaid one year
limitation of action period for all such claims shall begin to run not later than the
settlement date.

*See* Doc. 59-5 at 6 ¶ 13.  Like the others, this provision lends itself to only one natural reading:

- First, it incorporates the preceding portions of this provision, i.e., that the accrual
date applies to "claims," which clearly includes the Plaintiffs' claims (*see supra*).

- It extends to "claims" that are based on matters occurring before the settlement
date.  As discussed above, Plaintiffs' claims are based in part on facts occurring
before the settlement.  By the time of the settlement, Plaintiffs' home had already
been designed and constructed, and whatever alleged defects that Plaintiffs assert
existed in the attic and HVAC were already completed.

- Because Plaintiffs' claims are "claims" that involved facts and matters that occurred
before the settlement date, the accrual date for any "claims"—including the
Plaintiffs'—is "not later than the settlement date," and the limitation of action
period expired one year thereafter.

To remove all doubt, this provision also waived any application of the "discovery rule."  *Id.*  Thus,

the Purchase Agreement is clear: ___*any*___ actions relating to the design or construction of the home

must be asserted within one year of settlement. For a house purchased in November 2007, any claims needed to be asserted by November 2008. Although Plaintiffs suggest the Purchase Agreement could have been written differently, such was not required. The Purchase Agreement as written is clear and unambiguous, and unquestionably applies to Plaintiffs' claims.

### D. Strong Policy Reasons Support the Enforcement of the Limitations Provision

Despite acknowledging in the Purchase Agreement that the limitations provision was "completely reasonable in all respects," *id.*, Plaintiffs appear to argue that the limitations period is unfair in its application here because Dr. Telang had not sustained his injuries within the first year of the Plaintiffs' ownership of the house. This provision of the Purchase Agreement violates no public policy, and in fact is supported by public policies, and thus must be given effect.

"Generally, a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to a clearly expressed public policy." *Adamitis v. Erie Ins. Exch.*, 54 A.3d 371, 376 (Pa. Super. 2012). When examining whether a contract violates public policy, this Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract." *Id.*

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts … contrary to public policy. The courts must be content to await legislative action.

*Id.* (quoting *Eichelman v. Nationwide Ins. Co.*, 711 A.3d 1006, 1008 (Pa. 1998)). Thus, "[i]t is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice

of the community in so declaring [that the contract is against public policy]." *Id.* (quoting *Eichelman*, 711 A.3d at 1008).

By its enactment of statutes of limitations, Pennsylvania's General Assembly has demonstrated a strong public policy favoring finality and repose. *See, e.g.*, *Miller v. Hudson*, 528 Fed. Appx. 238, 240 (3d Cir. 2013) (citing *Kach v. Hose*, 589 F.3d 626, 643 (3d Cir. 2009)); *see also Estate of Hollywood v. First Nat'l Bank of Palmerton*, 859 A.2d 472, 480 (Pa. Super. 2004) (noting that the discovery rule is "inimical to UCC policies of [uniformity], finality, and negotiability" and that "considerations of commercial efficacy outweighed countervailing distributional concerns"). Likewise, Pennsylvania's statute of repose "represents a balance among public, industry, and individual interests." *Calabretta v. Guidi Homes, Inc.*, 241 A.3d 436, 443 (Pa. Super. 2020).

More specifically, "the only courts to consider a contractual accrual date provision have all enforced it." *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 838–39 (Pa. Super. 2006). Only "[i]n the absence of a contractual provision addressing accrual" will a court "apply ordinary Pennsylvania law when analyzing accrual." *PSC Info Group v. Lason, Inc.*, No. 08-cv-2176, 2008 U.S. Dist. LEXIS 84949, 2008 WL 4660943, at *14 (E.D. Pa. Oct. 22, 2008).

Setting the accrual date to coincide with the settlement date and requiring claims be filed within one year makes sense in light of the context of the Purchase Agreement. By the time of the settlement, NVR's design and construction of a customer's home is complete. Over the course of a year, a homeowner would have adequate time to determine if there are any defects in the home that require repair, replacement, or redesign. Given that Dr. Telang was aware of the design of the attic and the potential danger from stepping off the platform and onto the insulation, he could have

requested NVR to address the design of the attic before he sustained his injuries. *See* Doc. 59-13 at 25–31; Doc. 59-14 at 34–36.

In sum, the Purchase Agreement is clear and unambiguous. The claims Plaintiffs have asserted in this action plainly constitute "claims" under the Purchase Agreement, and the parties agreed in the Purchase Agreement that the settlement date would be the accrual date for any claims. This action was commenced nearly 12 years after the settlement date, long after the contractual limitations period. In short, Plaintiffs' claims are time-barred.

V.      **CONCLUSION**

For the reasons set forth above and in its principal submissions, NVR respectfully requests that this Court grant its motion for summary judgment.


Dated:  January 24, 2022                                Respectfully submitted,

                                                        **GALLAGHER GIANCOLA LLC**

                                                        */s/ Russell D. Giancola*
                                                        Kathleen A. Gallagher
                                                        PA I.D. No. 37950
                                                        kag@glawfirm.com
                                                        Russell D. Giancola
                                                        PA I.D. No. 200058
                                                        rdg@glawfirm.com
                                                        3100 Koppers Building
                                                        436 Seventh Avenue
                                                        Pittsburgh, PA  15219
                                                        412.717.1900 (Phone)
                                                        412.717.1901 (Fax)

                                                        *Counsel for Defendant,*
                                                        *NVR, Inc. d/b/a Ryan Homes*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 24, 2022, a true and correct copy of the **Reply Brief in Support of Motion for Summary Judgment** has been electronically served via CM/ECF on the below counsel of record:

Jonathan M. Gesk, Esq.
Gesk Moritz, LLC
14 East Main Street
Carnegie, PA  15106
jgesk@gesklaw.com

Brendan B. Lupetin, Esq.
Meyers Evans Lupetin & Unatin, LLC
707 Grant Street
Gulf Tower, Suite 3200
Pittsburgh, PA  15219
blupetin@meyersmedmal.com

*Counsel for Plaintiffs*

GALLAGHER GIANCOLA LLC

*/s/ Russell D. Giancola*
Kathleen A. Gallagher
Russell D. Giancola