IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RAHUL TELANG and ASHWINI )
GANDHE, husband and wife, )
)
      Plaintiffs, )
)
     v. )  Civil Action No. 19-1025
)
NVR, INC. trading and doing business as )
RYAN HOMES, )
)
      Defendant. )

## MEMORANDUM OPINION

Presently before the Court is the Motion for Summary Judgment and brief in support filed by Defendant NVR, Inc. t/d/b/a Ryan Homes ("NVR") in this matter (Docket Nos. 56, 58), the brief in opposition filed by Plaintiffs Rahul Telang ("Dr. Telang") and Ashwini Gandhe ("Dr. Gandhe") (collectively, "Plaintiffs") (Docket No. 61), and NVR's reply (Docket No. 64). In addition to the motion and briefs, the Court has considered the parties' concise statements and counter statements of material facts, and the appendices that were filed in connection with the briefs (Docket Nos. 57, 59, 60, 62, 63, 65).

For the reasons set forth herein, NVR's Motion for Summary Judgment is granted.

### I. Factual Background

As the parties are well-acquainted with the factual background of this case, at this juncture the Court will present an abbreviated version of the facts relevant to NVR's summary judgment motion. Plaintiffs, husband and wife, are homeowners, and NVR is a Virginia corporation that builds and sells homes in Pennsylvania and other states. (Docket Nos. 57, ¶¶ 1, 2; 60, ¶¶ 1, 2). On April 23, 2007, Plaintiffs and NVR entered into a Pennsylvania Purchase

Agreement, under which NVR agreed to build, and Plaintiffs agreed to purchase, a model home in Franklin Park Borough, Pennsylvania.  (Docket Nos. 57, ¶ 3, 4; 60, ¶¶ 3, 4).  After the parties executed the Purchase Agreement for the home, NVR built the home (the construction of which was completed in the fall of 2007), and Plaintiffs purchased the home from NVR on November 5, 2007.  (Docket Nos. 57, ¶¶ 10, 52; 60, ¶¶ 10, 52).  The model of Plaintiffs' home includes two furnace systems, one in the basement and one in the attic.  (Docket Nos. 57, ¶ 11; 60, ¶ 11).  As the model home is designed, the furnace/HVAC system in the home's attic sits on a plywood platform that is approximately six (6) feet by eight (8) feet in size, and a catwalk connects the attic opening to the attic platform.  (Docket Nos. 57, ¶¶ 12, 15; 60, ¶¶ 12, 15).  Blown insulation is installed in the space beside the attic platform opposite the catwalk.  (Docket Nos. 57, ¶ 16; 60, ¶ 16).  As Plaintiffs' home was actually built, however, Plaintiffs' attic platform measures approximately eight (8) feet by eight (8) feet, which is larger than the model's designed platform.  (Docket Nos. 57, ¶ 17; 60, ¶ 17).  Notably, Plaintiffs' attic furnace's return air filter access is located 63 inches (over five (5) feet) from the far end of the attic platform.  (Docket Nos. 57, ¶ 20; 60, ¶ 20).

During the construction process, Franklin Park Borough (the "Borough") conducts periodic inspections of homes as they are being built in order to assure that the homes comply with applicable building codes.  (Docket Nos. 57, ¶ 36; 60, ¶ 36).  One such inspection is a framing inspection, which here included an inspection of the passageway and platform that houses the furnace in Plaintiffs' attic.  (Docket Nos. 57, ¶¶ 37, 38; 60, ¶¶ 37, 38).  The Borough conducted a framing inspection of Plaintiffs' home on August 1, 2007, and that inspection did not note any deficiency with the framing of the attic, including the attic platform.  (Docket Nos. 57, ¶¶ 41, 42; 60, ¶¶ 41, 42).  On October 1, 2007, NVR applied for a certificate of occupancy

from the Borough for Plaintiff's house.   (Docket Nos. 57, ¶ 43; 60, ¶ 43).   The Borough completed all required inspections of Plaintiffs' house and issued a certificate of occupancy on October 31, 2007.   (Docket Nos. 57, ¶ 44; 60, ¶ 44).   Pursuant to § 3(c) of the Purchase Agreement, Plaintiffs conducted a pre-settlement demonstration of the house with the project manager, and Dr. Telang acknowledged having signed a Pre-Settlement Demonstration Report. (Docket Nos. 57, ¶¶ 46, 47; 60, ¶¶ 46, 47).   The Pre-Settlement Inspection Report noted that Plaintiffs reviewed the appliances and the attic insulation depth on October 31, 2007, and, other than noting that the attic steps lid needed to be touched-up and re-nailed, the report noted no other alleged defect in the attic.   (Docket Nos. 57, ¶¶ 48-50; 60, ¶¶ 48-50).   Dr. Telang does not dispute the accuracy of the Pre-Settlement Inspection Report.   (Docket Nos. 57, ¶ 51; 60, ¶ 51).

Plaintiffs moved into their home in 2008, and from the time they purchased the home until January 28, 2019 – a period of over 11 years – neither Plaintiffs nor anyone else changed the air filter in their attic furnace.   (Docket Nos. 57, ¶¶ 53, 54; 60, ¶¶ 53, 54).   Prior to January 28, 2019, Dr. Telang did go into the attic between one and three times in order to change a light bulb.   (Docket Nos. 57, ¶ 55; 60, ¶ 55).   On January 28, 2019, Dr. Telang entered the attic to change the air filter in the attic furnace.   (Docket Nos. 57, ¶ 56; 60, ¶ 56).   According to Plaintiffs, while Dr. Telang was in the attic, he fell through the insulation and ceiling joists on the far side of the attic platform which, as noted, is more than five (5) feet past the location of the return air filter access.   (Docket Nos. 57, ¶ 57; 60, ¶ 57).   Dr. Telang landed in the home's foyer below, allegedly suffering various injuries.   (Docket Nos. 57, ¶ 74; 60, ¶ 74; Docket No. 1-1).

When he went to the attic, Dr. Telang was accompanied by one of his sons, although that son did not enter the attic with his father and instead remained at the bottom of the attic stairs, so that son could not see his father in the attic.   (Docket Nos. 57, ¶¶ 59-61; 60, ¶¶ 59-61).

Plaintiffs' other son was in the kitchen when Dr. Telang went to the attic.  (Docket Nos. 57, ¶ 62; 60, ¶ 62).  Prior to the accident, Dr. Telang had warned both of his sons not to step on any insulation in the attic.  (Docket Nos. 57, ¶ 63; 60, ¶ 63).  As he was ascending the attic stairs, Dr. Telang advised both of his sons that "there is a platform in the attic, and there is insulation," and "you should always stay on the platform if you ever come up" to the attic.  (Docket Nos. 57, ¶ 64; 60, ¶ 64).  Dr. Telang also told his son that stepping on the insulation was dangerous. (Docket Nos. 57, ¶ 65; 60, ¶ 65).

No one saw Dr. Telang in the attic prior to the accident, and Dr. Telang has no recollection of what he was doing in the attic on that day.  (Docket Nos. 57, ¶¶ 66, 67; 60, ¶¶ 66, 67).  Dr. Telang has no recollection of the day of the accident, nor does he have any recollection of what caused his fall.  (Docket Nos. 57, ¶¶ 68, 71; 60, ¶¶ 68, 71).  Additionally, Plaintiffs' two liability experts do not know why Dr. Telang fell through the insulation and drywall ceiling to the foyer floor below.  (Docket Nos. 57, ¶¶ 72-75; 60, ¶¶ 72-75).

Plaintiffs filed the Complaint in this case in the Court of Common Pleas of Allegheny County, Pennsylvania, on July 30, 2019.  (Docket No. 1-1).  On August 15, 2019, NVR removed the action to this Court pursuant to the Court's diversity jurisdiction.  (Docket No. 1).  The Complaint includes three Counts brought against NVR under Pennsylvania law:  Count I – Negligence (Dr. Telang v. NVR); Count II – Professional Negligence (Dr. Telang v. NVR); and Count III – Loss of Consortium (Dr. Gandhe v. NVR).  (Docket No. 1-1 at 9-15).  Plaintiffs seek compensatory damages for injuries they have suffered, interest, and costs of suit.  (*Id.*).  The parties have completed fact and expert discovery.  (Docket Nos. 57, ¶ 78; 60, ¶ 78).  As explained, *supra*, NVR filed its Motion for Summary Judgment, which has been fully briefed by the parties, and the motion is now ripe for decision.

## II.    <u>Standard of Review</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).   A disputed fact is material if it might affect the outcome under the substantive law.  *See Boyle v. Cnty. of Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247-48).   Summary judgment is unwarranted where there is a genuine dispute about a material fact, that is, one where a reasonable jury, based on the evidence presented, could return a verdict for the non-moving party with regard to that issue. *See Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party without weighing the evidence or questioning the witnesses' credibility.  *See Boyle*, 139 F.3d at 393.  The movant has the burden of demonstrating the absence of a genuine issue of material fact, while the non-movant must establish the existence of each element for which it bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant has pointed to sufficient evidence of record to demonstrate that no genuine issues of fact remain, the burden is on the non-movant to search the

record and detail the material controverting the movant's position.  *See Schulz v. Celotex Corp.*, 942 F.2d 204, 210 (3d Cir. 1991).  Rule 56 requires the non-moving party to go beyond the pleadings and show, through the evidence of record, that there is a genuine issue for trial.  *See Celotex v. Catrett*, 477 U.S. at 324.

### III.   Discussion

As previously indicated, Plaintiffs' Complaint contains claims brought under Pennsylvania law for negligence and professional negligence, as well as a related claim for loss of consortium.  (Docket No. 1-1 at 9-15).  In moving for summary judgment, NVR argues that Plaintiffs' claims fail as a matter of law because the record is devoid of evidence regarding causation, because Plaintiffs commenced this action long after the contractual statute of limitations had expired, and because the derivative loss of consortium claim must also be dismissed.  The Court will address each of these arguments in turn.

#### A.   Lack of Evidence Regarding Causation

In moving for summary judgment, NVR first argues that, after having engaged in extensive fact and expert discovery, there is simply no evidence to show what caused Dr. Telang to fall through his home's attic floor at a point past the far end of the attic's furnace/HVAC platform.  NVR points out that Dr. Telang unequivocally testified in deposition that he recalls nothing from the day of the incident, and that no one else witnessed or knows what he was doing immediately before the accident occurred – when he fell at a point over five feet past the return air filter access, in an area that he had previously acknowledged was not safe to be entered.  Therefore, NVR contends, because Plaintiffs have failed to show that NVR's alleged negligence was the proximate cause of Dr. Telang's fall (*i.e.,* there is no evidence to support the essential

element of causation for Plaintiffs' negligence and professional negligence claims), NVR is entitled to summary judgment.

In support of its argument regarding the lack of evidence as to causation, NVR notes that "the mere happening of an accident is not evidence or proof of negligence on the part of anyone," and that a plaintiff in a negligence action "has the burden of proving by a fair preponderance of the evidence that defendant was negligent and that his negligence was the proximate cause of the accident." *Galullo v. Fed. Express Corp.*, 937 F. Supp. 392, 397 (E.D. Pa. 1996); *Kester v. Rutt*, 266 A.2d 713, 714 (1970). While Plaintiffs' Complaint includes separate Counts based on negligence and professional negligence, both claims of negligence and professional negligence under Pennsylvania law[1] must establish the basic elements of negligence, in that plaintiffs must show that "the defendant owed [the plaintiff] a duty; the defendant breached the duty; the plaintiff suffered actual harm; and a causal relationship existed between the breach of duty and the harm." *French v. Commonwealth Assocs., Inc.*, 980 A.2d 623, 630-31 (Pa. Super. Ct. 2009). Additionally, "[i]n determining whether a defendant's negligence is the proximate cause of a plaintiff's injury, Pennsylvania has adopted the 'substantial factor' test set forth in Section 431 of the Restatement (Second) of Torts (1965)," under which "a defendant's negligent conduct is not the proximate cause of plaintiff's injury

---

[1] Also, under Pennsylvania law:

> In a professional malpractice action, the determination of whether there was a breach of duty requires the plaintiff to additionally show that the defendant's conduct fell below the relevant standard of care applicable to the rendition of the professional services at issue. In most cases, such a determination requires expert testimony because the negligence of a professional encompasses matters not within the ordinary knowledge and experience of laypersons.
>
> * * *
>
> [W]e discern that there are two questions involved in determining whether a claim alleges ordinary as opposed to professional negligence: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of professional judgment beyond the realm of common knowledge and experience.

*French v. Commonwealth Assocs., Inc.*, 980 A.2d at 631 (quoting *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 934 A.2d 100, 104–05 (Pa. Super. Ct. 2007) (internal citations omitted)).

unless 'the alleged wrongful acts were a substantial factor in bringing about the plaintiff's harm.'" *Galullo*, 937 F. Supp. at 395 (quoting *E.J. Stewart, Inc. v. Aitken Prods., Inc.*, 607 F. Supp. 883, 889 (E.D. Pa. 1985)).

Furthermore, in considering the evidentiary record and whether a case should go forward to trial, it is important to note that, while juries may draw reasonable inferences from circumstantial evidence, there are limits to the inferences that a jury is permitted to draw. *See Fitzpatrick v. Natter*, 961 A.2d 1229, 1241 (Pa. 2008). "Viewed as a whole, the 'evidentiary threads' must be sufficient to 'lift [the] contention out of the realm of speculation.'" *Id.* (quoting *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 319 A.2d 914, 923 (Pa. 1974)). Although "the jury may draw reasonable inferences, it 'may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but . . . there must be evidence upon which logically its conclusion may be based.'" *Id.* at 1241-42 (quoting *Jones v. Treegoob*, 249 A.2d 352, 354 (Pa. 1969)). Thus, a jury must be able to draw reasonable inferences "without resort to prejudice or guess." *Id.* at 1242.

NVR asserts that the evidentiary record developed during discovery supports *none* of Plaintiffs' allegations as to NVR's alleged negligence or professional negligence, and so a jury would be forced to reach a verdict based on *no* evidence and thus through mere speculation, or by guessing, which is impermissible under the law. Specifically, the Complaint alleges that NVR was negligent in the following ways:

> a. In failing to inspect the residence for dangerous conditions prior to transferring ownership of the residence to the Telangs;
> b. In failing to warn the Telangs about the latent dangerous conditions prior to transferring ownership of the residence to the Telangs;
> c. In designing and constructing a residence that incorporated an attic appliance without having the necessary protections in place;
> d. In designing and installing an appliance platform without a protective railing;

e.  In designing and installing an appliance platform that lacked warnings or markings to indicate where the platform ended;

f.  In designing and installing an appliance platform without providing any warnings or marking to indicate where it was not safe to stand or step;

g.  In designing and constructing an attic that incorporated latent dangers, such as a 20-foot drop that was covered by blow-in insulation;

h.  In installing a furnace that did not clearly identify where the air filter was located;

i.  In failing to inform and warn the Telangs about the dangerous condition in the attic, including the latent 20-foot drop from the ceiling joists to the front foyer;

j.  In using blow-in insulation instead of batts insulation which caused the dangerous condition to be inconspicuous;

k.  In designing and/or installing the furnace which had condensate and gas lines running across the service platform causing a dangerous tripping hazard;

l.  In designing and installing the 2nd floor ceiling joists with such spacing so as to allow an individual to fall between the joists; and

m.  In installing a furnace platform that was too short, which contributed to the dangerous condition being latent.

(Docket No. 1-1, ¶¶ 30, 36).

As to these allegations, NVR points to the following evidence, or lack thereof.  To the extent that Plaintiffs allege a failure to warn of latent defects, with no evidence as to what Dr. Telang was doing in the attic when he fell five feet past the end of the platform, Plaintiffs cannot satisfy their burden to establish a causal link between NVR's alleged actions and Dr. Telang's injuries (subparagraphs b, e, f, i, j, and m).  Additionally, Dr. Telang's repeated warnings to his sons about the importance of remaining on the attic platform and not stepping on the insulation undercut any allegations as to the existence of a latent danger, which are also otherwise unsupported by any evidence (subparagraphs g, i, and l).  Furthermore, Plaintiffs' allegations of condensate and gas lines creating a tripping hazard is not supported by any evidence indicating that Dr. Telang tripped (subparagraph k).  There is also no evidence that Dr. Telang could not identify the location of the air filter access or that any such supposed inability to locate the air filter access contributed to his fall (subparagraph h).  Although Plaintiffs allege a failure to

inspect, the evidence shows that NVR inspected the attic with Plaintiffs, and that the Borough conducted inspections of the home as well (subparagraph a). Finally, NRV asserts that it is impossible for Plaintiffs to carry their burden of demonstrating that a protective railing or some other unspecified protections would have prevented Dr. Telang's fall, since there is no evidence as to how or why Dr. Telang fell as he did (subparagraphs c and d).

In its briefing, NVR also cites to a number of cases that support its argument that summary judgment is appropriate here because Plaintiffs have produced no evidence of causation – and since a jury would therefore have to speculate as to how Dr. Telang came to exit the attic platform and fall through the ceiling on the far side of the platform, at a distance of more than five feet past the location of the return air filter access. *See, e.g., Galullo v. Federal Express Corp.*, 937 F. Supp. 392, 399 (E.D. Pa. 1996) (granting summary judgment for the defendant where the injured plaintiff offered no direct evidence that she had slipped on a letterpack delivered by the defendant, where it was just as likely that the plaintiff had slipped on wet leaves or a rug, and where a jury "would be left to speculate whether the letterpack was the cause in fact of her injuries and such speculation by a jury is not permitted"); *Lattari v. 3180 MJT Corp.*, No. 140900773, 2016 WL 11469122 (Pa. Ct. of Common Pleas (Phila. Cnty.) Sept. 9, 2016) (granting summary judgment for the defendant where no one witnessed the decedent's fall and there was no evidence as to how the accident happened, and the court reasoned that the plaintiff had posited several theories why the defendant's negligence might have caused the plaintiff's fall, but numerous other equally possible theories existed whereby his fall may not have been due to any negligence by the defendant; and the plaintiff was not entitled to an inference of fact that amounted to a guess, speculation, or conjecture).

Upon consideration of NVR's argument, the Court finds that NVR has shown that, in order for a jury to find that NVR's conduct was the proximate cause of Plaintiffs' injuries (and to find that NVR was negligent and professionally negligent under Counts I and II), a jury would be forced to reach a verdict through mere speculation, or by guessing, because of the lack of evidence to support causation here.  Because the Court finds that NVR has pointed to sufficient evidence of record (or the lack of evidence) to demonstrate that Plaintiffs have failed to show causation in this case, Plaintiffs bear the burden to search the record and detail material controverting NVR's position.  *See Schulz v. Celotex Corp.*, 942 F.2d 204, 210 (3d Cir. 1991). The Court first notes that, in responding to NVR's motion, Plaintiffs appear to recognize the apparent lack of evidence showing causation as to their negligence and professional negligence claims, as cited by NVR.  In opposing NVR's argument, however, rather than indicating material from the record controverting NVR's position (and showing the Court that there is indeed evidence of proximate cause, and that there is a disputed issue of material fact here and a genuine issue for trial, *see id.*; *Celotex v. Catrett*, 477 U.S. 317, 324 (1986)), Plaintiffs instead attempt – belatedly – to assert a new basis for their claims.

Specifically, in response to NVR's summary judgment motion, Plaintiffs invoke the Restatement (Second) of Torts § 323(a) and argue for the first time in this case that such law applies here.  (Docket No. 61 at 5-10).  Section 323, otherwise known as the "Good Samaritan Rule," provides as follows:

> Negligent Performance of Undertaking to Render Services
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care **increases the risk of such harm** . . . .

Restatement (Second) of Torts § 323(a) (1965) (emphasis added).

In adopting the Good Samaritan Rule, the Pennsylvania Supreme Court explained that Section 323(a) applies only to "a particular class of tort actions," and that it "differs from those cases normally sounding in tort." *Hamil v. Bashline*, 392 A.2d 1280, 1286 (Pa. 1978); *see also Blessing v. United States*, 447 F. Supp. 1160, 1187 (E.D. Pa. 1978) (noting that Pennsylvania recognizes the so-called "good Samaritan rule"). Thus, the section applies when a defendant "render[s] services to another which he should recognize as necessary for the protection of the other's person or things." Restatement (Second) of Torts § 323. "It does not, however, change the burden of a plaintiff to establish the underlying elements of an action in negligence, nor can it be invoked to create a duty where one does not exist." *Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 (Pa. 1983). Accordingly, Section 323 has been applied in cases involving issues such as medical malpractice (*see Hamil*, 392 A.2d at 1280; *K.H. v. Kumar*, 122 A.3d 1080 (Pa. Super. Ct. 2015)), and the performance of safety inspections (*see Blessing v. United States*, 447 F. Supp. at 1160; *Isaacson v. Mobile Propane Corp.*, No. 1083, 1981 WL 207419 (Pa. Ct. of Common Pleas (Phila. Cnty.) Sept. 3, 1981)). Plaintiffs have not, however, cited to any case in which courts have applied Section 323 to claims against builders, and importantly, as NVR indicates, the Good Samaritan Rule entails a promise of protection, *see Miller v. United States*, 530 F. Supp. 611, 616-17 (E.D. Pa. 1982). The relationship between Plaintiffs and NVR, however, is governed by their Purchase Agreement, which contains no such promise of protection, and which thus renders the Good Samaritan Rule seemingly inapplicable to the facts of this case.

Moreover, NVR argues that even if the Good Samaritan rule could apply here (despite the existence of the parties' Purchase Agreement), the allegations in Plaintiffs' Complaint simply

do not state claims based on Section 323.  Upon consideration of the Complaint, the Court agrees.  Although Plaintiffs now suddenly contend in response to NVR's motion that their claims should be viewed as Section 323(a) negligence claims, nowhere in the Complaint do Plaintiffs allege that NVR's negligence *increased Plaintiffs' risk of harm*.  Rather, the Complaint alleges in a straightforward manner that Dr. Telang's injuries "were caused by the negligence of NVR," *i.e.,* that NVR's negligence directly caused Plaintiffs' harm, as a traditional tort claim may be pled (and, appropriate as to its professional negligence claim, that NVR's conduct, through its architect, failed to meet the standards of a reasonable licensed professional architect).  (Docket No. 1-1, ¶¶ 30, 36).  As the District Court explained in *Blessing v. United States*, "[s]uch boilerplate pleadings may provide an adequate allegation of proximate cause for some common law torts, but they would appear to be insufficient under §§ 323 and 324A."[2]  447 F. Supp. at 1197.  The *Blessing* Court further explained the pleading requirements for such Good Samaritan Rule claims as follows:

> Insofar as both of these sections provide that a negligent actor is liable for "physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if" the plaintiff or the one to whom the actor undertook to render services relied on the undertaking or **"if " the negligence increased the plaintiff's risk of harm** . . . the language of the Restatement assumes that the injuries somehow factually "result" from the defendant's negligence before it even reaches the issues of reliance of increased risk questions of legal cause.  **In other words, that harm "results" from the negligence charged is inadequate under the Restatement unless the harm is caused by increased risk or reliance.  Plaintiffs' allegations never get past the "resulting from" language of the Restatement, and so could be said not to address at all the issue of legal cause.**
>
> Thus, we do not here have ambiguous pleadings that might conceivably be read to include the necessary allegations . . . .  Rather, here we have a total failure to include, ambiguously or otherwise, any pleadings reaching the crucial causation factors under §§ 323 and 324A.  Because proximate cause is a critical element of a plaintiff's prima facie case in tort, **when under § 323**

---

[2]    Section 324A concerns "Liability to Third Person for Negligent Performance of Undertaking." Restatement (Second) of Torts § 324A (1965).

> **or § 324A the requisite reliance or <u>increased risk of harm</u> does not appear**, courts have dismissed, *DeJesus v. Liberty Mutual Insurance Co.*, *supra*, [223 A.2d 849 (Pa. 1966)] rendered summary judgment, *Clark v. Employers Mutual of Wausau*, 297 F. Supp. 286 (E.D. Pa. 1969), or directed verdicts for defendant, *Evans v. Liberty Mutual Insurance Co.*, *supra*, [398 F.2d 665 (3d Cir. 1968)] as the case's procedural posture made appropriate.

*Blessing*, 447 F. Supp. at 1197 (emphasis added).

Similarly, here, to the extent Plaintiffs now apparently wish to re-frame what appear to be traditional negligence and professional negligence claims as Section 323 Good Samaritan Rule claims, even if such claims could be brought in a case like this, Plaintiffs have not pled that NVR's alleged negligence increased Plaintiffs' risk of harm as required in a Good Samaritan Rule claim under Section 323(a).  Plaintiffs have thus not alleged a Section 323 claim in their Complaint as it is drafted, and it is simply too late for Plaintiffs to amend their Complaint – nor have Plaintiffs requested leave to do so – since the parties have completed discovery and are at the stage of summary judgment, and the time for amendment of the pleadings has long passed.

Therefore, the Court concludes that NVR has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law because there is no evidence of record showing that NVR's conduct was the proximate case of Dr. Telang's accident, which is a required element of Plaintiffs' negligence and professional negligence claims.  Plaintiffs have failed to rebut NVR's showing with the argument that they have offered in response – essentially that their burden of proof should be lowered here because their claims, which appear to be traditional negligence and professional negligence claims, should be viewed as Section 323 Good Samaritan Rule claims – which are *not* the type of claims that appear appropriate in light of the facts of this case, and which are *not* claims that are pled in the Complaint.  The Court therefore further concludes that Plaintiffs, in responding to NVR's motion, have failed to meet their burden to show that there is a disputed issue of material fact as

to the issue of causation based on the evidence of record.  Accordingly, the Court finds that NVR is entitled to summary judgment based on Plaintiffs' failure to show evidence of causation for the claims of negligence and professional negligence in Counts I and II of the Complaint.

### B.  The Contractual Limitation as a Bar to Plaintiffs' Claims

As an alternative basis in moving for summary judgment, NVR asserts that Plaintiffs' claims are time-barred based on the limitations provision in the parties' Purchase Agreement.  In response, Plaintiffs argue that such limitations provision does not apply here, and they contend instead that their claims are timely based on a common law standard for accrual of claims.  The Court looks to Pennsylvania contract law in considering the parties' differing positions here.

"Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'"  *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)).  "'Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence,' instead, the meaning of a clear and unequivocal written contract 'must be determined by its contents alone.'"  *Id.* (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)) (additional quotation marks and citation omitted).  "'Where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.'"  *Id.* (quoting *Steuart*, 444 A.2d at 661) (emphasis in original).

The parties' Purchase Agreement provides, in part, as follows concerning "Claims and Disputes":

> PURCHASER AND SELLER COVENANT AND AGREE THAT ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY CLAIMS BASED IN WHOLE OR IN PART ON

FACTS OCCURRING BEFORE SETTLEMENT, WHETHER KNOWN OR UNKNOWN, AND THAT ARISE OUT OF OR RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, SETTLEMENT HEREUNDER, THE AGREED IMPROVEMENTS TO THE PROPERTY (WHETHER AS-BUILT OR AS-PROMISED) AND/OR THE HEREIN DESCRIBED REAL ESTATE, REGARDLESS OF LEGAL THEORY AND REGARDLESS OF THE NAMED RESPONDENT(S)/DEFENDANT(S) ("CLAIMS"), SHALL BE GOVERNED BY A ONE (1) YEAR LIMITATION OF ACTION PERIOD AND BAR DATE RUNNING FROM THE DATE THE CLAIM OR CAUSE OF ACTION ACCRUES (IF AT ALL). CONSISTENT WITH THE FOREGOING, ALL SUCH CLAIMS BASED ON MATTERS OCCURRING BEFORE THE SETTLEMENT DATE SHALL BE DEEMED TO HAVE ARISEN AND ACCRUED, IF AT ALL, AND THE AFORESAID ONE YEAR LIMITATION OF ACTION PERIOD FOR ALL SUCH CLAIMS SHALL BEGIN TO RUN NOT LATER THAN THE SETTLEMENT DATE. WITH THE SOLE EXCEPTION OF COUNTERCLAIMS, ANY SUCH CLAIMS INITIATED IN ANY FORUM AGAINST ANY PARTY TO THIS AGREEMENT AND/OR THEIR JOINT AND SEVERAL SUCCESSORS, MEMBERS, AFFILIATES, EMPLOYEES, AGENTS, CONTRACTORS AND/OR SUPPLIERS BY ANY OTHER PARTY TO THIS AGREEMENT AND/OR THEIR SUCCESSORS, SUBROGEES AND ASSIGNS SHALL BE DEEMED AUTOMATICALLY BARRED AND PRECLUDED AS A MATTER OF LAW AND CONTRACT IF NOT FILED/INITIATED WITHIN THAT AGREED ONE (1) YEAR LIMITATION OF ACTION PERIOD FOLLOWING SETTLEMENT AND BEFORE SAID BAR DATE. ALL APPLICATION OF THE SO-CALLED "DISCOVERY RULE" IS MUTUALLY WAIVED BY THE PARTIES. BY EXECUTING THIS AGREEMENT, PURCHASER ACKNOWLEGES PURCHASER'S UNDERSTANDING AND AGREEMENT TO THESE TERMS AND THAT THE SAID ONE (1) YEAR PERIOD IS COMPLETELY REASONABLE IN ALL RESPECTS.

(Docket No. 59-5 at 5-6, § 13 (original is in bold).

NVR argues that the only natural reading of the Purchase Agreement is that Plaintiffs' claims here constitute "claims" as defined in that contract, and that the accrual date of such claims according to that contract is the settlement date in 2007. Accordingly, NVR reasons, the claims that Plaintiffs allege here had to have been asserted within one year of that settlement date in order to be timely.

Plaintiffs argue, however, that their claims accrued when Dr. Telang fell and sustained injuries, citing Pennsylvania case law.  *See, e.g., Kelly v. Carman Corp.*, 229 A.3d 634, 647 (Pa. Super. Ct. 2020) ("Generally, 'a cause of action accrues, and thus the applicable limitations period begins to run, when an injury is inflicted.'" (quoting *Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009)); *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011) (stating that, generally, a statute of limitations begins to run when a cause of action accrues, or when an injury is inflicted and the corresponding right to sue for damages arises).  Plaintiffs reason that Dr. Telang sustained injuries on January 28, 2019, and filed suit on July 30, 2019, which was within the one-year period after his fall.  Plaintiffs also posit that, because the language of the Purchase Agreement refers to "claims based on matters occurring before the settlement date shall be deemed to have arisen and accrued," the claims here are based on a "matter" that occurred after the settlement date – Dr. Telang's fall – and thus are subject to a one-year statute limitations from the date of the fall.  Plaintiffs thus suggest that the Court should find that there is ambiguity in the contract language here, and should interpret the word "matters" to mean "the incident that gives rise to the lawsuit," which Plaintiff says is Dr. Telang's fall, and not the negligent design and construction of Plaintiffs' house that is alleged in the Complaint, as NVR contends.  (Docket No. 61 at 13).

In response to Plaintiffs' argument, NVR breaks down the Purchase Agreement's language in greater detail to show that Plaintiffs' claims in this action clearly fit within the Purchase Agreement's definition of "claims."  NVR reasons that Plaintiffs' claims here arise out of and relate to the subject matter of the Purchase Agreement in that all such claims assert defects in NVR's design and construction of Plaintiffs' home, the construction of which was the subject of the Purchase Agreement.  NVR also points out that Plaintiffs' claims are based in part

on facts occurring before the settlement because, by the time of the settlement, Plaintiffs' home had already been designed and constructed, so any alleged defects that Plaintiffs claim existed in the attic had already been completed.   Additionally, NVR contends, the "including but not limited to" language in the Purchase Agreement means that, even to the extent Plaintiffs' claims are based on facts that occurred after the settlement, they are also included in the definition. Further, the Purchase Agreement's reference to both "known or unknown claims," which would include claims that had not obviously accrued at the time of settlement, are included within this definition of "claims."   Thus, NVR concludes that none of the terms within the Purchase Agreement's definition of "claims" is ambiguous, and that Plaintiffs' claims satisfy each element within that definition, so Plaintiffs' claims here clearly constitute "claims" under the Purchase Agreement.

Having shown that Plaintiffs' claims are "claims" under the Purchase Agreement, NVR next endeavors to show that the Purchase Agreement also establishes the contractual limitations period for the assertion of such claims.  The Purchase Agreement clearly provides that claims shall be governed by a one (1) year limitation of action period and bar date, and that it shall run from the date the claim or cause of action accrues (if at all).  (Docket No. 59-5 at 6, § 13).  The Purchase Agreement further provides that all such claims based on matters occurring before the settlement date shall be deemed to have arisen and accrued, if at all, and the aforesaid one-year limitation period shall begin to run not later than the settlement date (which, in this case, is 2007).  (*Id.*).

NVR argues that the natural reading of such provision incorporates the preceding portions of the provision, and thus the accrual date applies to "claims," including Plaintiffs' claims (discussed, *supra*).  By its terms, such provision expressly extends to "claims" based on

matters occurring before the settlement date, and Plaintiffs' claims, as pled, are based in part on facts occurring before the settlement (since Plaintiffs' home had already been designed and built, as discussed, *supra*).  Finally, NVR explains, because Plaintiffs' claims are "claims" that involve facts and matters that occurred before the settlement date, the accrual date for any such "claims" (including Plaintiffs' claims) is "not later than the settlement date," and the limitation of action period expired one year thereafter.

NVR notes that, to remove all doubt as to the application of the limitations provision, the Purchase Agreement expressly waived any application of the "discovery rule."  NVR also cites cases indicating strong policy reasons that support the enforcement of the limitations provision as it is written.[3]  *See, e.g., Adamitis v. Erie Ins. Exch.,* 54 A.3d 371, 376 (Pa. Super. Ct. 2012) ("'Generally, a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to a clearly expressed public policy,' and 'it is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].'" (quoting *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998) (additional internal quotation marks and citations omitted)); *PSC Info Group v. Lason, Inc.*, No. 08-2176, 2008 WL 4660943, at *5 (E.D. Pa. Oct. 21, 2008) (explaining that only "[i]n the absence of a contractual provision addressing accrual" will a court "apply ordinary Pennsylvania law when analyzing accrual"); *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 838-39 (Pa. Super. Ct.

---

[3]      NVR also notes that setting the claims accrual date to coincide with the settlement date and requiring claims to be filed within one year is logical in light of the Purchase Agreement's context.  By the time of the settlement, NVR's design and construction of a home would be complete, and over the course of the following year, a homeowner would have adequate time to determine whether there are any defects in the home that require repair, replacement, or redesign.  Thus, NVR states that, given the fact that Dr. Telang was aware of the attic's design and the potential danger in stepping off the platform and onto the insulation, he could have requested that NVR address the design of the attic during that time provided in the contract, before he sustained his injuries.

2006) (noting that the court in *Harbor Court Associates v. Leo A. Daly Co.*, 179 F.3d 147, 151 (4th Cir. 1999), in upholding a contractual accrual provision, was confirmed in its conclusion "by the fact that the only courts to consider a contractual accrual date provision have all enforced it.").

Upon consideration of the language of the parties' agreed-upon Purchase Agreement, Pennsylvania contract law, and the arguments set forth by the parties, the Court finds that NVR has set forth the natural reading of the limitation provision in light of the clear and unambiguous language of the contract, while Plaintiffs' position would require the Court to strain to find contract language ambiguity where none exists. The claims that Plaintiffs set forth in their Complaint clearly constitute "claims" under the terms of the Purchase Agreement. The Purchase Agreement plainly indicates that the settlement date would be the accrual date for any such claims. The parties agreed to the terms of the Purchase Agreement. This action was commenced nearly 12 years after the settlement date, which was long after the contractual limitations period had expired. Plaintiffs' claims here are thus time-barred.

Therefore, even if the Court were to find that NVR is not entitled to summary judgment based on the lack of evidence to show causation (discussed, *supra*), the Court finds, alternatively, that the negligence and professional claims here are barred by the contractual limitations period set forth in the parties' Purchase Agreement. Accordingly, the Court concludes that NVR is also entitled to summary judgment as to the claims alleged at Counts I and II of Plaintiffs' Complaint because such claims are time-barred.

### C. <u>Loss of Consortium</u>

Finally, NVR argues that, because it is entitled to summary judgment as to Dr. Telang's claims of negligence and professional negligence, the Court must also grant summary judgment

as to Dr. Gandhe's claim for loss of consortium.  "Pennsylvania courts have long held that an action for loss of consortium is derivative," and therefore the success of such claims "has always been dependent upon the injured spouse's right to recover."  *Scattaregia v. Shin Shen Wu*, 495 A.2d 552, 553-54 (Pa. Super. Ct. 1985).  Because the Court is granting summary judgment as to Dr. Telang's claims, Dr. Gandhe cannot succeed on her derivative claim for loss of consortium. *See Kryeski v. Schott Glass Techs.*, 626 A.2d 595, 602 (Pa. Super. Ct. 1993).  Therefore, the Court will grant NVR's motion for summary judgment as to Dr. Gandhe's claim for loss of consortium at Count III of the Complaint as well.

## IV.    Conclusion

Based on the foregoing, NVR's Motion for Summary Judgment (Docket No. 56) is granted.  NVR is entitled to summary judgment as to Counts I and II based on the lack of evidence to show causation, and, alternatively, such claims are also barred by the contractual limitations period set forth in the parties' Purchase Agreement.  Because the Court is granting summary judgment in favor of NVR as to Dr. Telang's claims at Counts I and II, Dr. Gandhe cannot succeed on her derivative claim for loss of consortium, and NVR is entitled to summary judgment as to Count III as well.  Accordingly, summary judgment is granted in favor of NVR as to all counts of Plaintiffs' Complaint.

An Order consistent with this Memorandum Opinion follows.


Dated: March 30, 2023                              *s/ W. Scott Hardy*
                                                  W. Scott Hardy
                                                  United States District Judge

cc/ecf:  All counsel of record